**THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
BRYSON CITY DIVISION
Civil Case No. 2:09cv46-MR
[Criminal Case No. 2:06cr25-MR]**

| | | |
|---|---|---|
| **SAMUEL EDDIE PHEASANT,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **vs.** | ) | **MEMORANDUM OF DECISION** |
| | ) | **AND ORDER** |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Respondent.** | ) | |
| | ) | |

**THIS MATTER** is before the Court on Petitioner's Motion to Vacate, Set

Aside or Correct Sentence, filed pursuant to 28 U.S.C. § 2255 [Doc. 1], as

amended [Doc. 3], and Respondent's Motion for Summary Judgment [Doc. 8].

## I.    PROCEDURAL BACKGROUND

On August 8, 2006, Petitioner was charged in a Bill of Indictment with

first-degree murder of an individual within the boundaries of the Eastern Band

of Cherokee Indian Reservation, in violation of 18 U.S.C. §§ 1111 and 1153

("Count One"), and with using and carrying a firearm in furtherance of the

crime of violence of murder, as charged in Count One, in violation of 18

U.S.C. §§ 924(c)(1)(A)(iii) and 924(j)(1) ("Count Two").  [Case No. 2:06cr25,

Doc. 8].

Petitioner pleaded not guilty, and his case was tried before a jury on December 4, 2006. The jury found Petitioner guilty of both counts. On October 26, 2007, the Court[1] sentenced Petitioner to a term of life imprisonment on Count One plus a consecutive 120-month term on Count Two. [Id., Doc. 27].

Petitioner filed a timely notice of appeal. [Id., Doc. 29]. On appeal, Petitioner claimed that the Court improperly refused to give the jury instructions for the lesser included offenses of voluntary and involuntary manslaughter. Noting that "the evidence of malice was not contested," and that Petitioner "admitted that he fired the shot from twenty yards away," the Court of Appeals concluded that Petitioner was not entitled to an instruction for a lesser included offense. United States v. Pheasant, 320 F. App'x 160, 161 (4th Cir. 2009) (unpublished). Petitioner did not seek a writ of *certiorari* from the United States Supreme Court.

On August 21, 2009, Petitioner filed the present § 2255 motion, asserting the following claims of ineffective assistance of counsel:

---

[1]Petitioner's trial and sentencing were conducted by the Honorable Lacy H. Thornburg. Upon Judge Thornburg's retirement this case was reassigned to the undersigned.

(1)     Counsel was ineffective for failing to advise him that he had a right to testify and for precluding Petitioner from testifying in his own defense regarding his lack of intent to kill the deceased ("First Ground for Relief");

(2)     Counsel was ineffective for failing to seek a plea agreement as requested by Petitioner (Second Ground for Relief");

(3)     Counsel's errors in failing to advise him of his right to testify and in precluding him from testifying denied Petitioner his right to present a complete defense ("Third Ground for Relief");

(4)     Counsel was ineffective for failing to challenge the jury selection pool ("Fourth Ground for Relief"); and

(5)     Counsel was ineffective for failing to investigate and to call witnesses who would have refuted the Government's theory as to "specific intent and premeditation" (Fifth Ground for Relief").

[Doc. 1-1].  Petitioner further requested an evidentiary hearing on his claims

pursuant to 28 U.S.C. § 2255(b).  [Id. at 16].

On August 27, 2009, the Court directed the Government to respond to

Petitioner's allegations by October 29, 2009.  [Doc. 2].  Before the

Government responded, Petitioner filed a motion seeking to amend his § 2255

motion to: (1) add an additional ineffective assistance claim based on

counsel's alleged failure to challenge the Court's finding that Petitioner had

the ability to make restitution payments ("Sixth Ground for Relief") and (2)

have the Court modify the portion of the Judgment which ordered him to pay restitution to the victims of his crimes.  [Doc. 3].

On November 3, 2009, the Government moved for an extension of time to respond to Petitioner's § 2255 motion, citing the need for additional time to obtain an affidavit from Petitioner's trial counsel.  [Doc. 5].  The Court granted the Government's motion and extended the deadline for responding to November 12, 2009.  [Doc. 6].  The Government filed its Answer and Motion for Summary Judgment on November 10, 2009.  [Docs. 7, 8].[2]  In an Order entered April 30, 2010, the Court recognized that Petitioner was allowed to amend his Petition as a matter of right pursuant to Rule 15(a) of the Federal Rules of Civil Procedure, and thus denied the Petitioner's Motion to Amend as moot.  Because the Government had not addressed this newly added claim in its Answer, however, the Court allowed the Government an opportunity to respond.  [Doc. 20].  The Government filed an Answer to this claim on May 30, 2010.  [Doc. 21].

_____

[2]In his Reply brief, Petitioner objects to the Court allowing the Government an extension of time to respond after the deadline for responding had already passed, arguing that the Government should have been found to be in default for failing to respond timely.  [Doc. 9 at 1 n.1].   The Court notes that Petitioner did not file a motion for default at the time that the Government's response was due.  Even if such motion had been made, however, the Government demonstrated good cause for an extension of time, even though the deadline for responding had passed.  Further, Petitioner has not demonstrated any prejudice resulting from the brief extension granted to the Government.  Petitioner's objection, therefore, is without merit.

## II.    FACTUAL BACKGROUND

The evidence presented at trial showed the following.  On July 1, 2006, Petitioner, an enrolled member of the Eastern Band of Cherokee Indians, was engaged in drinking and socializing with the victim, Dennis Lloyd Teesateskie, and two other men, Tracy West and Steven Kekahbah.  [Case No. 2:06cr25, Trial Transcript ("Trans."), Docs. 35-36 at 226-27, 268-71].  When they ran out of beer, the four decided to drive to a convenience store.  [Id., Trans.. Doc. 35 at 230].  West was driving his pick-up truck, with Petitioner in the passenger seat and Teesateskie and Kekahbah riding in the bed of the truck.  [Id.].  At least initially, the four were interacting in a friendly, social manner, and continued to converse with each other through the small, sliding glass window in the rear of the truck during the trip.  [Id. at 233].  This changed when Petitioner apparently took some offense at a comment made by one of the back passengers.  Although West did not hear the comment, Petitioner became irate and demanded that West stop the truck.  [Id. at 233-34].  West ignored Petitioner's repeated commands to stop the truck, but shortly thereafter, West had to stop for a stop sign.  Once stopped, Petitioner grabbed a chain that had been on the floor at his feet, wrapped it around his hand, and exited the truck.  [Id. at 234-35].  Petitioner then demanded that Teesateskie get out of the truck.  Although Teesateskie initially refused to

5

comply, he and Kekahbah both got out at Petitioner's insistence. [Id. at 235-36]. West saw the three men standing at the rear of the truck. West then momentarily looked away due to traffic. When he looked back approximately two seconds later he saw Teesateskie and Kekahbah still standing, but Petitioner was on the ground, apparently having been punched. [Id. at 236].

West saw Teesateskie help Petitioner, who had a bloody mouth, back to his feet and back into the passenger seat. West also heard Teesateskie tell Petitioner, "I didn't want to fight you." Teesateskie even offered Petitioner another beer, which Petitioner accepted. [Id. at 237]. Thereafter, the trip resumed without further incident. After purchasing more beer, West drove Teesateskie and Kekahbah back to Teesateskie's brother's house and dropped them off. West then took Petitioner to the home of his grandmother, Emaline Driver. [Id. at 238-39].

Driver's daughter, Velma Bradley, was visiting her mother that day, and she saw Petitioner there. She noticed that Petitioner had some blood around his mouth, but she did not believe that he needed medical attention. [Id. at 205-06]. She also saw that he had a rifle in his possession. [Id. at 211-12]. Bradley testified that Petitioner was looking for a ride to the Big Cove area of the Eastern Band of Cherokee Indian reservation. [Id. at 206]. Velma Bradley's nephew offered to take him, but they could not get the car to start,

so Petitioner borrowed his grandmother's Ford Escort. [Id. at 207-09]. When Bradley realized she had left her pocketbook in the Ford Escort, she got a ride to Big Cove to retrieve it from Petitioner. [Id. at 210-12].

Joseph Johnson testified that he too interacted with Petitioner that afternoon. Petitioner stopped by Johnson's house late in the day to discuss some yard work he was supposed to do that day. [Id. at 277-78]. It was apparent to Johnson that Petitioner had been drinking, and he also noticed that Petitioner had some blood on his face. [Id. at 278-81]. The two agreed that the yard work would be rescheduled for another day. [Id.]. More than an hour after Petitioner left Johnson's home, Johnson heard the radio traffic about the shooting on his police scanner. [Id. at 280].

Meanwhile, Bradley eventually caught up to Petitioner. [Id. at 118, 213]. Petitioner had stopped the green Ford Escort on the side of the road in front of Bradley's home in Big Cove. Velma Bradley approached the car and told Petitioner that she needed her purse. Petitioner allowed her to get it, and when she did she saw the rifle in the front seat. [Id. at 213-14]. She told Petitioner that her mother (Petitioner's grandmother) needed her car to go out of town. She testified that Petitioner responded, "I'm not coming back." [Id. at 215]. Petitioner's demeanor concerned Velma Bradley enough that she called her daughter, Nikki Bradley, who resided with her in Big Cove. Velma Bradley

told her daughter that she needed to leave the house because Petitioner was there with a gun and she "didn't know what he was going to do." [Id.].

Nikki Bradley was Teesateskie's girlfriend. Nikki testified she lived with her mother, and that Teesateskie and Kekahbah arrived at their home around 5:30 on the afternoon of the shooting. [Id. at 118, 147]. Shortly after arriving, Teesateskie and Nikki drove to the gas station to put gas in the truck. During the trip, they passed Petitioner on the road a few times. [Id. at 119]. They returned to the Bradleys' home at approximately 6:30. [Id. at 120]. As they were getting ready to leave again, they received the call from Velma Bradley warning them to leave the house because Petitioner had been drinking and was "mad." [Id.]. Nikki Bradley got in the front of the truck, while Teesateskie and Bradley's two children, ages four and six, got in the bed of the truck. The kids sat on Teesateskie's lap. [Id. at 120-21]. Nikki Bradley started to back-up when she saw Petitioner "standing there pointing a gun at us." [Id. at 120].

Petitioner was standing next to the green Ford Escort parked on the side of the road, pointing a rifle over the roof of the car, "aiming." [Id. at 120, 125]. Nikki Bradley testified that she yelled, "Don't shoot," because her children were there. Teesateskie told the children to hide. [Id. at 126]. As Teesateskie got out of the truck, and as the children crawled through the small sliding glass window into the cab of the truck, Bradley heard a gunshot. [Id.

at 127-28].  She then saw Teesateskie running toward Petitioner.  While Bradley was moving the truck, she observed Teesateskie and Petitioner fighting over the rifle.  Although she did not see the entire fight, when it was over she picked the rifle up off the ground, had Teesateskie get into the car and drove away. [Id. at 129-30].  Teesateskie then stated that he had been shot and needed to go to the hospital.  Bradley took him to the emergency room, where he later died.  [Id. at 131-32].  The autopsy revealed the cause of death to be a single gun shot wound to the abdomen.   [Id. at 154].

Following the shooting, Petitioner drove to the Cherokee Indian Police Department and encountered Jose Rodriguez, an off-duty police officer. Officer Rodriguez testified that Petitioner, who was "covered in blood," said, "Jose, I shot him. I f----ed up."  [Id. at 187].  When asked who was shot, Petitioner said, "I shot Skin," a nickname for Teesateskie.  [Id. at 127, 188]. When the officer asked Petitioner where the gun was, he indicated that "some of Skin's people had it."  [Id. at 192].  Petitioner also stated that he was bleeding from being hit in the head by Teesateskie.  [Id. at 190].  Rodriguez turned him over to Sgt. Neil Ferguson, who testified that Petitioner also spontaneously uttered to him, "Hey, man, I f---ed up. I shot him in the stomach. I f---ed up really bad." [Trans., Doc. 36 at 284].

Petitioner provided a statement to FBI Special Agent Stuart Kelley following a waiver of his Miranda rights.  [Id. at 308-10].  Petitioner began by stating that "We were at my aunt's. When I shot him, I was drunk."  [Id. at 308].  When the agent asked why Petitioner shot Teesateskie, he replied, "He pissed me off, man."  [Id. at 311].

## III.    STANDARD OF REVIEW

At the time that the Respondent's Motion for Summary Judgment was filed, Rule 56(c) of the Federal Rules of Civil Procedure provided that summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c) (2009).[3]  The Rule further provided, in pertinent part, as follows:

> When a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must -- by affidavits or as otherwise provided in this rule -- set out specific facts showing a genuine issue for trial.  If the opposing party does not so respond, summary judgment should, if appropriate, be entered against that party.

Fed. R. Civ. P. 56(e)(2) (2009).

---

[3] Rule 56 has since been amended, but the amendment is not germane to the application of the Rule to this case.

On a motion for summary judgment, the moving party has the burden of production to show that there are no genuine issues of fact for trial. Once the moving party has met that burden, the non-moving party has the burden of persuasion to establish that there is a genuine issue for trial.

> When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. In the language of the Rule, the nonmoving party must come forward with specific facts showing that there is a genuine issue for trial. Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.

Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (internal quotation marks, citations, and footnote omitted).

## IV. DISCUSSION

In order to prevail on a claim of ineffective assistance of counsel, a petitioner must show that: (1) "counsel's representation fell below an objective standard of reasonableness," and (2) "the deficient performance prejudiced the defense." Strickland v. Washington, 466 U.S. 668, 687-88, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984). In measuring counsel's performance, there is "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Id. at 689, 104 S.Ct. 2052. A

petitioner seeking post-conviction relief bears a "heavy burden" to overcome this presumption. Carpenter v. United States, 720 F.2d 546, 548 (8th Cir. 1983). Conclusory allegations do not overcome the presumption of competency. Id.

To demonstrate prejudice, Petitioner must show a probability that the alleged errors worked to his "*actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." Murray v. Carrier, 477 U.S. 478, 494, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986) (emphasis in original) (quoting United States v. Frady, 456 U.S. 152, 170, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982)). Under these circumstances, Petitioner "bears the burden of proving Strickland prejudice." Fields v. Attorney Gen. of Md., 956 F.2d 1290, 1297 (4th Cir. 1992) (citing Hutchins v. Garrison, 724 F.2d 1425, 1430-31 (4th Cir. 1983)). If Petitioner fails to meet this burden, "a reviewing court need not consider the performance prong." Fields, 956 F.2d at 1297 (citing Strickland, 466 U.S. at 697, 104 S.Ct. 2052). In considering the prejudice prong of the analysis, the Court must not grant relief solely because Petitioner can show that, but for counsel's performance, the outcome of the proceeding would have been different. See Sexton v. French, 163 F.3d 874, 882 (4th Cir. 1998). Rather, the Court "can only grant relief under . . . Strickland if the 'result of the proceeding was fundamentally unfair or

unreliable.'" Id. (quoting Lockhart v. Fretwell, 506 U.S. 364, 369, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993)).

## A.    Petitioner's Right to Testify

In his First and Third Grounds for Relief, Petitioner contends that his trial counsel provided constitutionally deficient representation by failing to inform him of his right to testify at trial in his defense, and that his trial counsel actually prevented him from testifying, which prevented him from presenting an adequate defense. [Doc. 1-1 at 4-7, 9-10]. Petitioner "asserts that had he been advised that he had a right to testify . . . he would have insisted on exercising that right, and . . . he would have provided testimony refuting the Government's evidence establishing, not only the 'specific intent to kill' [the victim], but also the first degree murder charge itself." [Id. at 4-5]. Specifically, Petitioner contends that had he testified, he would have told the jury that:

> I did not intend to kill Dennis Teesateski, because if I intended or had the intent to kill him, I could have easily shot him in the head from 20 yards away. I can shoot the fire off of [a] cigarette that is in the mouth of a person 20-30 yards away. I could shoot the fire off a candle 20 to 30 yards away. [I] . . . used to line up coins about 30 to 40 yards away and shoot them....
>
> *    *    *
>
> ....Yes, I did shoot him intentionally in the stomach to hurt him but not to kill him. And even though the FBI

Agent said that he asked me why did I kill [Teesateskie] and [I] supposedly said because he pissed me off, man. This does not mean that I had specific intent to kill [him], but only that I was answering his question....

[Petitioner's Aff., Doc. 1-2 at ¶¶ 4, 7].

Contrary to Petitioner's argument, trial counsel was not ineffective in failing to inform Petitioner of his right to testify at trial. Notably, Petitioner does not allege that he did not <u>know</u> of his right to testify, but only that his trial counsel did not reiterate that fact for him. Petitioner's criminal history, as detailed in his Presentence Report ("PSR"), would belie any claim that he was unaware of his right to testify. Petitioner's criminal history begins in 1991, at the age of 22 and includes no less than eight convictions on three charges of driving under the influence, two charges of possession of marijuana, and possession of drug paraphernalia, among other convictions. Petitioner's extensive history in the criminal justice system demonstrates beyond doubt that Petitioner was aware of his right to testify on his own behalf. <u>See</u> <u>Parke v. Raley</u>, 506 U.S. 20, 37, 113 S.Ct. 517, 121 L.Ed.2d 391 (1992) (noting that evidence of defendant's experience with criminal justice system is relevant to determining whether his waiver of constitutional rights was done knowingly). Because Petitioner does not allege that he was unaware of his right to testify at trial, this claim of ineffective assistance is so "palpably incredible" and so

"patently frivolous" that summary dismissal is warranted. <u>United States v.</u> <u>White</u>, 366 F.3d 291, 296 (4th Cir. 2004).

Next, Petitioner claims that trial counsel gave him erroneous legal advice that "precluded" him from testifying at trial. [Doc. 1-1 at 5]. In his Fifth Ground for Relief, he further contends that counsel failed to call various witnesses who would have refuted the Government's theory regarding Petitioner's specific intent and premeditation. [<u>Id.</u> at 18-19]. Petitioner, however, cannot show that counsel's actions were erroneous. Petitioner contends that his counsel advised him that it would not be wise to testify that he intentionally shot the victim in the stomach with a rifle only to hurt him. He further contends that counsel failed to contact certain witnesses who would have testified that Petitioner "could have easily shot [the victim] in the head from 20 yards away if he [truly] had the 'intent to kill [him].'" [Doc. 1-1 at 19]. Although Petitioner second-guesses counsel's tactical decisions regarding such evidence, he has not overcome the presumption afforded under <u>Strickland</u> that such decisions were "sound trial strategy." <u>Strickland</u>, 466 U.S. at 689, 104 S.Ct. 2052.

Even if Petitioner could establish that he was unaware of his right to testify or that he was "precluded" from testifying through erroneous legal advice, Petitioner still fails to allege the prejudice required to prevail under

Strickland. Neither Petitioner's boastful statements nor the testimony of various witnesses regarding his keen marksmanship would have helped him had he chosen to present this testimony in his defense at trial. In fact, this testimony would only have reinforced the jury's conclusion that Petitioner intentionally fired a deadly weapon at the victim and thereby caused his death. Petitioner was charged with murder, which is defined as "the unlawful killing of a human being with malice aforethought." See 18 U.S.C. § 1111(a). "To prove malice, the Government does not have to show an intent to kill or injure. Rather, malice aforethought may be established by evidence of conduct which is reckless and wanton and a gross deviation from a reasonable standard of care, of such a nature that a jury is warranted in inferring that defendant was aware of a serious risk of death or serious bodily harm." United States v. Williams, 342 F.3d 350, 356 (4th Cir. 2003) (citations and internal quotation marks omitted). Petitioner's frank admission that he intentionally shot the victim in order to hurt him provided overwhelming evidence that Petitioner was aware of a serious risk of death or serious bodily harm when he aimed a rifle at the victim and shot him in the abdomen. Petitioner's explanation of his lack of intent to *kill* the victim would have been irrelevant to the jury's determination of malice, especially in light of Petitioner's admitted intent to inflict bodily harm. Any testimony from witnesses regarding Petitioner's ability to hit

precise targets at long distances would have only served to further doom his case. Accordingly, Petitioner has failed to show how he was prejudiced by counsel's actions in advising him not to testify and in failing to call other witnesses to testify regarding his shooting skills.

For these reasons, the Court concludes that Petitioner's First, Third, and Fifth Grounds for Relief are without merit.

### B. Failure to Seek Plea Agreement

In his Second Ground for Relief, Petitioner contends that his trial counsel was ineffective for failing to advise him that he could enter a plea of guilty and thereby avoid having to go to trial. [Doc. 1-1 at 7-8]. As Petitioner concedes, he "knew the evidence against him was overwhelming (Petitioner had confessed to the shooting and turned himself in to the Police Department.)." [Id. at 8]. Because of the strength of this evidence, and due to his stated intent only to "inflict pain" and not kill the victim, Petitioner claims that he wanted to enter a plea to involuntary manslaughter. [Id.]. As the Government explains in its Response, however, while Petitioner's trial counsel "worked diligently to get a plea agreement on an offense with less than a life sentence," the Government declined to offer a plea agreement of any kind. [Doc. 7 at 19-20]. Accordingly, no amount of effort by Petitioner's counsel could have resulted in a plea agreement such as Petitioner desired. Because

Petitioner's allegations fail to demonstrate either deficient performance by counsel or resulting prejudice, Petitioner's Second Ground for Relief is summarily dismissed.

### C. Failure to Challenge Jury Pool

In his Fourth Ground for Relief, Petitioner argues that counsel was ineffective for "failing to challenge the Jury Selection Pool pretrial because the jury venire 'excluded members of distinct groups' and the jury did not 'represent a fair cross section of the community.'" [Doc. 1-1 at 12-13]. Specifically, Petitioner contends that "[t]here are very few if any Native Americans pooled for jury selection and absolutely no Hispanics or Asiatic-Blacks [sic] pooled," and that "the system of jury selection in the Western District of North Carolina facially targets Natives, Blacks & Hispanics which [is] 'highly subjective' or is 'susceptible of abuse as applied.'" [Id. at 13-14 (citations omitted)].

It is well-established that a defendant has a right to a trial by a jury drawn from a cross-section of the community. See Duren v. Missouri, 439 U.S. 357, 363-64, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979). To establish a *prima facie* violation of the fair-cross-section requirement, a defendant must show the following:

> (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the

representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.

Id. at 364, 99 S.Ct. 664. As with any ineffective assistance claim, Petitioner carries the burden of proving he suffered prejudice because of his trial counsel's alleged failure to challenge the jury pool. More specifically, Petitioner must prove that his trial counsel's performance resulted in "errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Strickland, 466 U.S. at 687, 104 S.Ct. 2052.

Petitioner has failed to allege any facts to show that his counsel's performance fell below an objective standard of reasonableness or that he was prejudiced by counsel's alleged failure to object to the selection of the jury pool. Petitioner offers only conclusory allegations which fail to show any actual discrimination in the selection of the jury pool. Though Petitioner claims the jury selection system in the Bryson City division "facially targets Natives, Blacks & Hispanics [and is] 'highly subjective' or is 'susceptible of abuse as applied,'" Petitioner has offered no forecast of evidence and has identified no examples of affirmative discrimination in the jury selection system. Even if Native Americans, African-Americans, Hispanic-Americans,

and Asian-Americans were under-represented in the jury pool, Petitioner has alleged nothing to show that this is the result of systematic exclusion and not merely a product of demographics in the division. Because he cannot show that a timely objection would have been successful, Petitioner has failed to show that he was prejudiced by his counsel's alleged ineffectiveness in failing to object to the jury selection pool. Accordingly, this claim is summarily dismissed.

### D. Failure to Request an Intoxication Instruction

Petitioner further claims that counsel was ineffective for failing to request a "voluntary intoxication" instruction. [Doc. 1-1 at 20-21]. This claim is entirely without merit. During the charge to the jury, the Court specifically instructed the jury on the issue of intoxication and informed the jury that they could consider this evidence in deciding whether Petitioner had formed the specific intent to commit first degree murder. [Case No. 2:06cr25 Trans., Doc. 36 at 414-15]. Petitioner's argument is directly contradicted by the record in this matter and is therefore overruled.

### E. Failure to Challenge Restitution Order

Petitioner next argues that his trial counsel was ineffective for failing to challenge the Court's judgment concerning the order of restitution and specifically to challenge the Court's finding regarding his financial ability to

make restitution payments.  [Doc. 3 at 1-2].  Petitioner also contends that the restitution order violates the Eighth Amendment's prohibition on cruel and unusual punishment.  [Id.].

Petitioner's argument under the Eighth Amendment is procedurally barred in this habeas proceeding because he failed to raise this issue on direct appeal to the Fourth Circuit.  See United States v. Pregent, 190 F.3d 279, 285 n.5 (4th Cir. 1999).  Claims which could have been but were not raised on direct appeal are not subject to collateral review absent a showing of cause and prejudice or that a fundamental miscarriage of justice would result absent review.  Id.  Here, Petitioner has made no such showing, and therefore, his Eighth Amendment claim is dismissed.

In arguing that his counsel was ineffective for failing to challenge the restitution order, Petitioner claims that he "is unable to live appropriately under prison living conditions because of the amount of money that is taken away from him" pursuant to the restitution order.  [Doc. 3 at 1].  Petitioner maintains that the Court's finding regarding his ability to make restitution payments was erroneous and his counsel's failure to challenge the order was deficient and caused him prejudice under Strickland.  [Id.].

The PSR noted that Petitioner, as an enrolled member of the Eastern Band of Cherokee, is entitled to semi-annual per capita checks from the tribe's

gaming revenue. The PSR concluded that this money ensured that Petitioner had the financial ability to make an immediate payment to cover his fine and restitution obligations. During his sentencing hearing, the Court noted that no objections had been filed to the PSR. [Case No. 2:06cr25, Sent. Trans., Doc. 37 at 2]. Petitioner acknowledged to the Court that he had reviewed the contents of the PSR with his attorney and that he understood the contents of the report. [Id.]. Petitioner's counsel further advised the Court that she had personally reviewed the contents of the PSR with Petitioner and that she believed that he understood its contents. [Id.].

Petitioner has failed to plead a case for ineffective assistance of counsel or resulting prejudice under Strickland. Petitioner concedes that the tribe would likely have per capita checks which he would have been entitled to were it not for the restitution order. In fact, Petitioner even filed a letter with the Court which stated that he would quit claim any interest in the per capita checks until the restitution order was satisfied. [Case No. 2:06cr25, Doc. 43 at 1 ("The reason I'm writing is to let you all [know] that the Eastern Band of the Cherokee Indians is going to start keeping my [per capita] checks until the restitution gets paid every last cent of it. I already wrote to them [the Eastern Band of Cherokee] and let them know to keep my checks.")]. Petitioner has waived his objection to the restitution by failing to raise this issue of law on

direct appeal. Moreover, Petitioner has waived his argument on this issue by clearly evidencing his decision not to contest the use of his per capita checks to satisfy his restitution obligation. Petitioner's arguments that his counsel was somehow ineffective, and that he suffered prejudice because she did not challenge the restitution order, are purely without merit and will therefore be dismissed.

## F. Request for Evidentiary Hearing

Petitioner requests an evidentiary hearing on his claims. [Doc. 1-1 at 16]. The Court may decide a § 2255 motion without an evidentiary hearing if "the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief." 28 U.S.C. § 2255(b). Upon consideration of the record, the submissions of the parties, and the applicable law, the Court finds that the record conclusively shows that Petitioner is not entitled to any relief. Accordingly, his motion can be resolved without an evidentiary hearing. See Raines v. United States, 423 F.2d 526, 529 (4th Cir. 1970). Petitioner's request for an evidentiary hearing is denied.

Pursuant to Rule 11(a) of the Rules Governing Section 2255 Proceedings for the United States District Courts, the Court declines to issue a certificate of appealability as Petitioner has not made a substantial showing of a denial of a constitutional right. 28 U.S.C. § 2253(c)(2); Miller-El v.

Cockrell, 537 U.S. 322, 336-38, 123 S.Ct. 1029, 1039-1041, 154 L.Ed.2d 931 (2003) (in order to satisfy § 2253(c), a petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong); Slack v. McDaniel, 529 U.S. 473, 484, 120 S.Ct. 1595, 146 L.Ed.2d 542 (2000) (when relief is denied on procedural grounds, a petitioner must establish both that dispositive procedural ruling is debatable, and that the petition states a debatable claim of the denial of a constitutional right).

## V.    CONCLUSION

**IT IS, THEREFORE, ORDERED** that the Respondent's Motion for Summary Judgment [Doc. 8] is **GRANTED**.

**IT IS FURTHER ORDERED** that Motion to Vacate, Set Aside or Correct Sentence, filed pursuant to 28 U.S.C. § 2255 [Doc. 1], as amended [Doc. 3], is **DENIED** and **DISMISSED**.

**IT IS FURTHER ORDERED** that the Court declines to issue a certificate of appealability.

**IT IS SO ORDERED.**        Signed: September 6, 2012

Martin Reidinger
United States District Judge